## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MALCOLM D. SMITHSON, et al.,**

           Plaintiffs,

      vs.                                  No. 1:06-cv-0624 MCA/RLP

**AMERADA HESS CORPORATION n/k/a**
**HESS CORPORATION,**

           Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Plaintiffs' Motion No. 1 for Partial Summary Judgment Striking Hess' Affirmative Defense of Mandatory Arbitration with Supporting Authorities* [Doc. 81], filed January 22, 2008, and *Defendant Hess Corporation's Motion to Compel Mandatory Arbitration of "Price" Claims and to Stay Proceedings Pending Arbitration* [Doc. 83], filed January 25, 2008.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court concludes that Plaintiffs' Motion should be **DENIED** and Defendant's Motion should be **GRANTED in part**.

## I.      BACKGROUND

This is a class action for alleged royalty underpayment brought by the plaintiff royalty owners against Defendant Hess Corporation ("Hess").  Plaintiffs allege that Hess has underpaid royalties to the class members on carbon dioxide ("$CO_2$") extracted from the Bravo Dome Carbon Dioxide Unit ("the Unit") in eastern New Mexico.  Plaintiffs' *Class*

*Action Complaint for Breach of Contract, Damages and Declaratory Relief* [Doc. 136-2] ("Complaint"), asserts three claims for relief: (1) breach of contract and of the covenant of good faith and fair dealing; (2) breach of implied covenant to market; and (3) declaratory judgment and injunction.

The $CO_2$ extracted from the Unit is transported through high pressure transmission pipelines to a terminus point in the area of Denver City, Texas, from where it may be further transported to other destinations. Defendant Hess uses $CO_2$ in "enhanced oil recovery" operations in mature oil fields in a process that involves injecting compressed $CO_2$ into oil bearing reservoirs. The injected $CO_2$ mixes with and displaces the hydrocarbons from the pore spaces in oil bearing formations, thereby enhancing recovery. [Doc 136-2 at 9.]

Plaintiffs, or their predecessors in interest, and Hess were parties to a previous class action lawsuit (the "Feerer Class Action") in this district, which also concerned royalty payments on $CO_2$.[1] The document at the center of the present litigation is the class action settlement agreement (the "Feerer Settlement Agreement" or "FSA") executed by Hess and other oil companies in 1998 to settle the Feerer Class Action. Plaintiffs bring this action alleging that Hess has breached the FSA in a variety of ways.

The threshold issue presented by the instant motions is whether any of Plaintiffs' claims are subject to mandatory arbitration under the FSA's arbitration clause. The second question is, assuming that any claims are arbitrable, whether Hess has waived arbitration by

---

[1]The previous class action case was styled *Doris Feerer, et al. v. Amoco Production Company, et al.,* No. 95cv12 JC/WWD.

participating in the lawsuit and by excessive delay in moving to compel arbitration.

Hess asserts that Plaintiffs' claims present a mix of arbitrable and nonarbitrable disputes. Hess argues that it was not until near the close of discovery, in November and December 2007, that it was able to discern the arbitrable nature of some of the claims and that its motion to compel arbitration was timely if measured from the time that it became clear that this lawsuit involved claims that are subject to arbitration. Hess seeks a stay of this litigation pending arbitration.

Plaintiffs, on the other hand, assert that none of the claims are arbitrable. They argue that the matter is controlled by the New Mexico Court of Appeals decision in *Heimann v. Kinder Morgan CO2 Co.*, 140 N.M. 552, 144 P.3d 111 (N.M.Ct. App. 2006), which construed and applied the same arbitration clause at issue here. Plaintiffs argue alternatively that Hess has been aware of the nature of the claims since the outset of this lawsuit and strategically delayed moving to compel arbitration until the eve of trial.[2] Plaintiffs thus press for a finding that Hess has waived arbitration.

## II.    STANDARD OF REVIEW

The FSA containing the arbitration clause is a "contract evidencing a transaction involving commerce" since it involves the extraction of $CO_2$ in one state for use in another. *See* 9 U.S.C. § 2; *see also Cummings v. Fedex Ground Package Sys., Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005). The FSA calls for the application of federal law to issues of

---

[2]At the time Hess filed its motion, trial was approximately six weeks away. However, the trial date was subsequently vacated and the matter has since been reassigned to the undersigned District Judge after the Honorable Judge Browning recused. A trial date has not been reset.

3

procedure and New Mexico law to issues of contract interpretation.[3] [Doc. 136-2 at 66 (FSA ¶ 56).]  Because I find no significant differences between New Mexico law and federal law on the issues involved here such as would affect the outcome with respect to arbitration, there is no need to grapple with the choice of law question.

As a matter of both federal policy and New Mexico state policy, arbitration is strongly favored.  *Comanche Indian Tribe v. 49, L.L.C.,* 391 F.3d 1129, 1131 (10th Cir. 2004); *Fernandez v. Farmers Ins. Co. of Ariz.*, 857 P.2d 22, 25 (N.M. 1993).  Nonetheless, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (quotations omitted).  "Absent some ambiguity in the [arbitration] agreement, ... it is the language of the contract that defines the scope of disputes subject to arbitration." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002).  "As with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000) (alteration and quotations omitted); *see also McMillan v. Allstate Indem. Co.*, 84 P.3d 65, 69 (N.M. 2003) ("Courts must interpret the provisions of an arbitration agreement according to the rules of contract law and apply the plain meaning of the contract language in order to give effect to the parties' agreement.")

---

[3]Some courts have held that if the contract evidences a transaction involving interstate commerce, the Federal Arbitration Act applies, notwithstanding the insertion of a choice of law provision. *Youngs v. Am. Nutrition, Inc.*, ___ F.3d___, No. 06-4203, 2008 WL 3126145, *3 n.4 (10th Cir. Aug. 7, 2008); *Foster v. Turley*, 808 F.2d 38, 41 (10th Cir. 1986).

When the parties dispute the existence of a valid and enforceable arbitration agreement, it becomes the initial task of the Court to decide as a threshold issue whether such an arbitration agreement exists. *See, e.g.*, *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779–80 (10th Cir. 19989). In this case, however, the existence of a valid arbitration agreement is not disputed. The heart of the dispute is whether any of Plaintiffs' claims fall within the scope of the agreement to arbitrate. "[A] disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court." *Howsam*, 537 U.S. at 84.

Under New Mexico law, the scope of an agreement to arbitrate is a matter of contract interpretation. *Campos v. Homes by Joe Boyden, LLC*, 140 P.3d 543, 546 (N.M. Ct. App. 2006). The intention of the parties as to the scope of arbitrable issues is determined from the contract as a whole. *Id.* Any ambiguity or doubts should be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941 (1983) (holding that "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability"); *see also Heimann*, 144 P.3d at 114. "The primary objective in construing a contract is not to label it with specific definitions or to look at form over substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." *Heimann*, 144 P.3d at 116 (quoting *Shaeffer v. Kelton*, 619 P.2d 1226, 1229 (N.M. 1980)). When, as here, the court construes a narrow arbitration clause, it must "take

5

care to carry out the specific and limited intent of the parties." *Heimann*, 144 P.3d at 119 (quoting *Cummings*, 404 F.3d at 1262).

Federal law provides guidance for determining whether a particular dispute falls within the scope of an agreement's arbitration clause. *Cummings*, 404 F.3d at 1261 (citation and quotation marks omitted). The inquiry proceeds as follows:

> First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

*Cummings*, 404 F.3d at 1261 (italics omitted) (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001)). "Broad" arbitration clauses are those that purport to refer to arbitration all disputes arising out of a contract, while "narrow" clauses limit arbitration to specific types of disputes. *Id.* (citing *McDonnell Douglas Fin. Corp. v. Penn. Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988)).

With these standards in mind, the Court considers the FSA and its arbitration clause.

## III.   OVERVIEW OF THE FSA

### A.   The Royalty Methodology and CO2 Pricing

#### 1.   Methodology for calculating royalties

The FSA establishes a methodology for calculating royalty settlement payments to

6

class members for production of Unit CO2 occurring on January 1, 1998 and thereafter.  The

methodology requires Hess to pay royalty on "allocated" volumes of CO2, which the parties

agree means volumes that Hess is entitled to extract, not what is actually extracted.  The FSA

further provides that royalties are to be calculated on the basis of volume weighted average

of Hess's prices for Unit CO2, utilizing a "net-back" methodology to adjust prices for sales

or other dispositions occurring downstream of a certain specified point.  [Doc. 136-2 at 41.]

Under the FSA, Hess is prohibited from deducting marketing fees and certain other costs

from its royalty payments.  Transportation fees that it may deduct are specifically defined

and capped.  [Id. at 32–37.]

### 2.    Pricing of CO2

Although the FSA sets out a methodology, it does not specify the price for CO2 that

Hess is to use in the methodology to arrive at the royalty payments.  Rather, the FSA states

that Hess is to utilize the prices or values in certain contracts, designated as "Qualified

Contracts," that Plaintiffs have approved for use in the methodology.  [Doc. 136-2 at 41.]

"Qualified Contracts" for Hess are defined as those contracts listed in Exhibit D-2 of the

FSA.  [Id. at 42 (FSA ¶ 14(e)).]  Exhibit D-2, in turn, lists ten contracts by contract number,

date, party, and type.  [Id. at 73 (FSA Ex. D-2).]

Approval of the prices and values established under the Qualified Contracts is limited

in duration.  Paragraph 14(i) of the FSA states that:

> The approval as provided herein of prices or values established under Qualified
> Contracts shall extend for the term of such contracts and to those volumes generated
> thereby....With regard to any amendments, changes, or extensions of Qualified

Contracts occurring after the date of this Agreement and that extend the term of the contracts, affect the volumes covered, price to be paid or price formula to be utilized, or charge to be imposed or formula to be utilized in establishing such charge, such approval shall not extend or apply to volumes affected by such amendments, changes, or extensions.

[Doc. 136-2 at 43 (FSA ¶ 14(i).] Thus, the price or value established under the Qualified Contracts is approved only so long as the Qualified Contracts have not expired, been amended, changed, or extended. Subparagraph 14(i) has parallel provisions regarding approval of "Qualified Other Transportation Charges."

The FSA does not specify how prices for $CO_2$ are to be determined after the Qualified Contracts expire (or are amended, changed, or extended). Instead, the FSA expressly leaves the propriety of such "future benchmarks" to later determination:

Nothing herein is intended to suggest that other benchmarks that may be utilized in the future to determine royalty settlement values that are not characterized as qualified or approved herein, or that future royalty payments resulting from the use of such benchmarks, are improper....Hess...on the one hand, and Plaintiffs and members of the Class, on the other, intend only, to omit any agreement concerning whether or not such future benchmarks, and resulting future royalty payments, are or are not proper.

[Id. at 42 (FSA ¶ 14(c)).]

Though Plaintiffs approved the prices under Qualified Contracts, they expressly reserved the right to challenge future prices under Non-Qualified Contracts:

With respect to Non-Qualified Contracts and Non-Qualified Other Transportation Charges, nothing herein shall be construed to affect or supplant any legal or contractual duties that may be owed by...Hess...to [its] Respective Owners in entering into contracts for the sale or other disposition of Unit $CO_2$ and for accounting for royalty thereon, or in incurring or establishing transportation charges or transportation deductions utilized in account for royalty, or to waive, impair or otherwise affect any future claims that may accrue in favor of the Owners relating thereto, including, but not limited to, *any claim that a Non-Qualified Contract or Non-Qualified Other*

8

*Transportation Charges relied upon in establishing royalty settlement values is improper for any reason.*

[Doc. 136-2 at 44 (FSA ¶ 14(j)) (emphasis added).]

### B.    The Arbitration Agreement

Paragraph 16 of the FSA constitutes the parties' agreement to arbitrate certain price

disputes.  The arbitration agreement states as follows:

> Any claims asserted by Plaintiffs or members of the Class against...Hess...regarding (a) the price or value under Non-Qualified Contracts (or under amendments to or extensions of contracts establishing new prices or values under Qualified Contracts as referenced in sub-paragraph 14(i) above) utilized by...Hess...in establishing royalty settlement values for purposes of payment to [its] Respective Owners and, (b) regarding Non-Qualified Other Transportation Charges (or amendments to or extensions of contracts or other arrangements establishing Qualified Other Transportation Charges as referenced in sub-paragraph 14(i) above) utilized by...Hess...in establishing royalty settlement values for purposes of payment to [its] Respective Owners, shall be submitted to and decided by binding arbitration pursuant to the following provisions.  Within ten(10) days after notice by one party to the other of its demand for arbitration, which demand shall also set forth the matter or matters to be submitted and the name of its arbitrator, the other party shall name its arbitrator, identify any additional matter(s) to be submitted, and so notify the demanding party. Within ten (10) days thereafter the two arbitrators shall select a third arbitrator.  The arbitrators shall decide the matters submitted within ninety (90) days of the completion of the hearing.  The decision of any two of the three arbitrators shall be binding on the parties.   In all other respects, arbitration shall be conducted in accordance with and pursuant to the Commercial Rules of the American Arbitration Association and judgment upon the award may be entered in any court having jurisdiction thereof.  This provision concerning arbitration applies only to the claims identified in this paragraph 16 and shall, in no event, apply to any future claims for breach of this Agreement.

[Doc. 136-2 at 45 (FSA ¶ 16).]

## IV.    ANALYSIS

### A.    The Parties' Positions

9

The parties agree that paragraph 16 of the FSA is a valid and binding arbitration clause. The dispute is over whether any of Plaintiffs' claims fall within its scope.

Plaintiffs argue that the arbitration clause is narrow and does not reach any of their claims. According to Plaintiffs, this lawsuit consists solely of claims for breach of the FSA, and as such, fall within the exclusionary clause of the arbitration agreement. Plaintiffs argue that this result is mandated by *Heimann*. In the alternative, Plaintiffs argue that even if some claims are arbitrable, Hess has been on notice of their arbitrable nature since the outset of this lawsuit in 2006 and has waived arbitration by failing to make a timely demand to arbitrate.

Hess concedes that the arbitration clause is a narrow one, and that at least some of Plaintiffs' claims are excluded from arbitration. Hess argues, however, that it became apparent through the discovery process that some of Plaintiffs' price claims are arbitrable. According to Hess, Plaintiffs' claims trigger the arbitration clause because they relate—at least in part—to the prices and values established in Non-Qualified Contracts. The FSA defines Non-Qualified Contracts as "all contracts for the sale, exchange, or other disposition of $CO_2$ entered into by Amoco, Hess or Shell after the date of [the FSA], or not listed in Exhibit D-1, D-2, or D-3 [of the FSA]." [Doc. 136-2 at 43 (FSA ¶ 14(f)).] Hess argues that such claims are not properly characterized as claims for breach of the FSA and that they are, instead, the type of dispute the parties agreed to arbitrate.[4]

---

[4]A central point of contention in this case appears to be whether the price of $CO_2$ should be tied to the price of oil. As stated above, the Complaint describes how $CO_2$ is gathered and used in enhanced oil recovery operations ("EOR"). Plaintiffs allege that $CO_2$'s "proper, true economic value is directly related to the value of other hydrocarbons that are recovered and sold by virtue of the $CO_2$ injection." [Doc. 136-2 at 10 (Complaint ¶ 18).] One of Plaintiffs' primary grievances is that while the price of oil

**B.      Substantive Scope of the Arbitration Agreement**

The Court agrees that the arbitration clause at issue here is narrow.  It covers only a particular type of royalty dispute:  a dispute over Non-Qualified or Qualified Contract prices as referenced in subparagraph 14(i) of the FSA.  Furthermore, claims for breach of the FSA are expressly excluded from arbitration.  [Doc. 136-2 at 45 (FSA ¶ 16).]  The parties' disagreement concerns whether any of Plaintiffs' claims fall within its narrow confines.

Because this case presents a situation where the arbitration clause is narrow and expressly excludes a broad category of disputes, the Court elects first to describe the type of claims that are excluded from arbitration.  Because claims for breach of the FSA are excluded from arbitration, a full understanding of the scope of the arbitration clause and its exclusion requires that it be read in conjunction with the obligations imposed by the FSA.

**1.      Scope of the Exclusion**

As explained above, the FSA requires Hess to follow a certain defined methodology or formula for calculating royalty on $CO_2$ produced on or after January 1, 1998.  It requires the use of the approved pricing mechanisms in ten enumerated Qualified Contracts, and it limits the fees that may be deducted from royalty payments.  Thus, a claim that Hess abandoned or did not follow the methodology, failed to use prices approved under the Qualified Contracts, or that it deducted unauthorized fees are all properly characterized as claims for breach of the FSA.  Such claims are expressly excluded from arbitration.

---

continues to increase, their royalty payments have decreased dramatically.  [Doc. 136-2 at 12, (Complaint ¶ 26).]  The Court reaches no conclusion and expresses no opinion regarding this dispute.

With respect to the methodology, the FSA requires payment on allocated volumes of $CO_2$ and utilization of a "net-back" methodology to adjust prices. The FSA itself, however, does not define the price of $CO_2$. Rather, it refers to ten, apparently external pricing mechanisms or "benchmarks," identified as "Qualified Contracts," whose pricing Plaintiffs approved for use in the methodology. Under the terms of the FSA Plaintiffs' approval of the Qualified Contracts extends only so long as the Qualified Contracts are not amended, changed, extended, or expire. Any of these events operates to terminate approval of the pricing mechanism contained in the Qualified Contract.

A dispute indirectly suggested by the briefing is whether the use of Non-Qualified Contract pricing is a breach of the FSA methodology. Plaintiffs apparently assert that it is, or might be a breach under certain circumstances. Hess, on the other hand, appears to believe that the FSA does not require it to rely exclusively on Qualified Contract pricing, and that it may also use Non-Qualified Contract pricing. The Court expresses no opinion on the merits of this dispute. What is relevant with regard to arbitration is that any claim by Plaintiffs that Hess used Non-Qualified Contracts, *i.e.*, unapproved pricing, in the FSA methodology is in essence a claim that Hess departed from the methodology. To resolve this dispute would require the Court to determine whether or under what circumstances the FSA allows the use of Non-Qualified Contract pricing, or, in other words, whether the use of Non-Qualified Contracts constitutes a breach. Thus, a dispute regarding whether the use of Non-Qualified Contracts is proper under the FSA does not trigger arbitration.

Equally important to the analysis is an understanding of what claims are *not* excluded.

12

The FSA contemplates that, at some unspecified time in the future, each of the ten Qualified Contracts would terminate, be amended, changed, or extended, and Plaintiffs' approval of the pricing mechanism therefore eventually would expire.  [Doc. 136-2 at 43 (FSA ¶ 14(i)).] The FSA does not undertake to define the new pricing mechanisms—*i.e.*, future benchmarks—that would take the place of the Qualified Contracts once approval expired. Determination of the future benchmarks is a matter on which the parties to the FSA purposefully omitted agreement.  [Doc. 136-2 at 42 (FSA ¶ 14(c)).]  The FSA does contemplate, however, that Hess might turn to pricing $CO_2$ using Non-Qualified Contracts to establish royalty settlement values once approval of the Qualified Contracts had terminated.  [Doc. 136-2 at 44 (FSA ¶ 14(j)).]  Plaintiffs expressly reserved the right to challenge the future benchmarks used to establish royalty settlement values.  [Doc. 136-2 at 44 (FSA ¶ 14(j)).]  Because the FSA expressly omitted any agreement regarding whether such future benchmarks were proper or improper, a claim that the future benchmarks used by Hess are improper is not a claim for breach.  The arbitration clause's exclusionary provision, which excludes claims for breach of the FSA, therefore does not reach such a claim.

### 2.    Scope of Mandatory Arbitration

Having delineated the scope of the exclusion, the Court now turns to examine the arbitration clause itself.  It provides that disputes regarding "the price or value under Non-Qualified Contracts (or under amendments to or extensions of contracts establishing new prices under Qualified Contracts as referenced in sub-paragraph 14(i)" shall be submitted to

binding arbitration.  [Doc. 136-2 at 45.]

Under this Court's reading of the FSA, disputes over future benchmarks are subject to arbitration.  The Court reaches this conclusion by reading the arbitration clause, not in isolation, but in context with other provisions of the FSA.  Paragraph 16 refers to subparagraph 14(i), which defines when price approval under the FSA terminates, at which point Qualified Contracts may no longer serve to provide pricing and future benchmarks under Non-Qualified Contracts necessarily must come into play.  Subparagraph 14(c) states that agreement regarding whether such future benchmarks, *i.e.*, prices, are proper or improper is expressly omitted.  Subparagraph 14(j) states that Plaintiffs expressly reserve the right to assert claims that a Non-Qualified Contract used in the future to establish royalty settlement values is improper.  The analysis then comes full circle back to paragraph 16 which requires arbitration of challenges to prices or values under Non-Qualified Contracts (or amendments to or extensions of contracts establishing new prices or values under Qualified Contracts).

The arbitration clause is specifically limited to disputes over "price" or "value."  It does not apply to disputes regarding whether the use of Non-Qualified Contract prices is in itself improper.[5]  The arbitration clause applies to disputes over new CO2 prices, regardless whether the dispute arises because Hess has used a Non-Qualified Contract to price CO2, or used a Qualified Contract that is no longer approved because it has been extended or amended.  [Doc. 136-2 at 45, (FSA ¶ 16).]  This construction is also consistent with the

_____

[5]The Court realizes that whether or under what conditions the FSA permits the use of other than Qualified Contracts is contested, and does not decide the issue.

14

parties' express agreement to omit from the FSA any provision regarding whether future benchmarks and resulting future royalty payments are proper.

### C.    Evidence that Plaintiffs' price claims are subject to mandatory arbitration

Having determined that the clause is narrow, and defined its parameters, the Court next considers whether Plaintiffs have raised a dispute within the purview of the arbitration clause.  It is important to this Court that the dispute in the present case be evaluated in the context of the FSA.

To begin the analysis, it is important to note that the Court is not bound by Plaintiffs' characterization of their claims as claims for breach of the FSA.  *E.g.*, *Altresco Philippines, Inc. v. CMS Generation Co.*, No. 96-1080, 111 F.3d 140, 1997 WL 186257, *3 (10th Cir. Apr. 17, 1997) (unpublished); *see also In re Oil Spill By the "Amoco Cadiz" Off the Coast of France Mar. 16, 1978*, 659 F.2d 789, 794 (7th Cir. 1981) (holding that "[w]ere the rule otherwise, a party could frustrate any agreement to arbitrate simply by the manner in which it framed its claims.")  Instead, the Court examines the allegations and facts proffered in support thereof, and Plaintiffs' damages theories and determines whether the claims fall within the scope of the agreement to arbitrate.  *See id.*  It would not serve either the intent behind the FSA, or the liberal policy favoring arbitration, to permit Plaintiffs to avoid mandatory arbitration simply by characterizing their allegations as claims for breach of contract.

Hess asserts that the arbitration clause was triggered in November 2007 by allegations made in the Second Supplemental Report of Plaintiffs' expert, George Donkin and at his

subsequent deposition.  Hess argues that Mr. Donkin's Second Supplemental report, taken together with his deposition testimony, revealed that Plaintiffs are attacking not only Hess' purported departure from the methodology required by the FSA, but also Hess' pricing of $CO_2$ under circumstances where approved—*i.e.*, Qualified Contract—pricing, had expired or been terminated.

In the Second Supplemental Expert Report of George L. Donkin, dated November 7, 2007, Mr. Donkin expresses his opinion regarding the range of values that would constitute "proper" $CO_2$ prices during the period January 2000 through September 2003.  [Doc. 83-11 (Hess Ex. J); Doc. 95-35 at 3.][6]  Although Mr. Donkin has calculated damages, it is not clear that he is attacking the $CO_2$ prices used by Hess.  Rather, he opines that the prices used by Hess during this time period were "proper" in that they bore a reasonable relationship to the price of West Texas Sour Crude Oil during the same time period.  [See Hess Ex. J,  Second Supp. Report of George L. Donkin, ¶¶ 6–10: Doc. 83-11, doc. 95-35 at 3.]

In his deposition two days later, however, Mr. Donkin explained that he had been advised that "[a]ll qualified contracts from Exhibit D2 to the original Feerer settlement appear to have expired by their original terms or been modified, amended...or extended." [Doc. 83-12 at 3.]  He therefore prepared the Second Supplemental Report in response to a request from Plaintiffs that he determine proper pricing in the event that there are no longer

---

[6]The Court notes that page 3 of Mr. Donkin's report was omitted from Exhibit J.  For the text of the omitted page 3, the Court refers to another document of record in this case where Mr. Donkin's report also appears: as an exhibit to *Plaintiffs' Response to Hess Corporation's Consolidated Statement of Undisputed Material Facts and Plaintiffs' Statement of Material Facts Not in Genuine Dispute in Support of Responses to Defendant's Motions* [Doc. 95-35], filed February 12, 2008.

CO2 volumes flowing under Qualified Contracts.  [Id.]  As explained by Mr. Donkin, "if there are no qualified contracts in existence, and if the parties have not approved or agreed to non-qualified contracts, the only standard left for royalty pricing of plaintiff[s'] gas is the standard identified in the [FSA] that the prices under either future benchmarks or under non-qualified contracts, if they're going to be used, must be proper or not improper."  [Id. at 3–4.]

These statements by Mr. Donkin, taken together with his Second Supplemental Report indicate that Plaintiffs are, at least to some extent, challenging not only the propriety of using Non-Qualified Contracts in the FSA methodology, but also the purportedly new benchmarks or pricing of CO2.  This was confirmed by their supplemental responses to discovery served December 6, 2007, in which they stated:

> In the event the meaning of 14(c) is that Qualified Contract volume weighted average prices apply only to the volumes under such contracts (as interpreted by defendant); and when Qualified Contract terms have expired or are no longer approved (because of amendment, change or extension) and when Non-Qualified Contracts are used, then the FSA standard is that Hess prices must be "proper" and not "improper for any reason."  14(c), 14(j).  That requirement has been breached by Hess.

[Doc. 83-6 at 3 (Hess Ex. E).][7]  Though couched in "breach" language, this response indicates that Plaintiffs dispute the prices that took the place of the Qualified Contract prices.

As explained above, the propriety of "future" benchmarks, *i.e.*, the benchmarks that take the place of the Qualified Contracts, is the subject matter of the arbitration clause, which states that any claims asserted by Plaintiffs against Hess regarding the price or value under

---

[7]The Court notes that the full text of Plaintiffs' interrogatory response is not shown on Exhibit E because page 4 of the exhibit is missing.  The Court therefore relies on the text quoted in Hess' brief, to which Plaintiffs have not objected.

Non-Qualified Contracts (or under amendments to or extensions of contracts establishing new prices or values under Qualified Contracts) are subject to mandatory arbitration. Although Plaintiffs assert that none of their claims trigger the arbitration provision, they do not dispute Hess' characterization of the nature of their claims or deny that they are challenging prices under Non-Qualified Contracts. If there are no longer any Qualified Contracts that can serve as benchmarks, and Plaintiffs challenge the pricing under Non-Qualified Contracts, then arbitration of those claims is mandatory.

Plaintiffs' arguments that Hess' construction of the FSA is erroneous are beside the point. Hess concedes that Plaintiffs have alleged a number of claims that are not arbitrable because they are properly characterized as claims for breach of contract. Such nonarbitrable claims include Hess' alleged "failure to pay royalty based on allocated (i.e. its 10% ownership entitlement to Unit $CO_2$, not lesser volumes taken) volumes of Unit $CO_2$, alleged failure to pay royalty based on the weighted average for its sales or dispositions of Unit $CO_2$, and alleged failure to use the prices established by Qualified Contracts. These constitute breach of contract claims. This does not change the fact that Plaintiffs have also put at issue future benchmarks or prices under Non-Qualified Contracts (or under amendments to or extensions of contracts establishing new prices or values under Qualified Contracts).

## D.    Waiver

Plaintiffs argue both in their *Motion No. 1 for Partial Summary Judgment Striking Hess' Affirmative Defense of Mandatory Arbitration* [Doc. 81] and in their response to Hess' Motion to Compel Arbitration, that Hess has waived arbitration. They assert that the nature

18

of its claims has been clear from the beginning of the lawsuit, yet Hess delayed for nearly 16 months before moving to compel arbitration on the eve of trial.

A party seeking to prove waiver of an agreement to arbitrate bears a heavy burden of showing it has been prejudiced. *Adams v. Merrill Lynch Pierce Fenner & Smith*, 888 F.2d 696, 701 (10th Cir. 1989); *Bd. of Educ. Taos Mun. Schs. v. The Architects, Taos*, 709 P.2d 184, 185 (N.M. 1984). "The determination of waiver seldom turns on a single inconsistent act or failure to act." *United Nuclear Corp. v. Gen. Atomic Co.*, 597 P.2d 290, 301 (N.M. 1979). Rather, courts look "to the totality of the proof in each case to arrive at a decision." *United Nuclear Corp.*, 597 P.2d at 302; *see also Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1490 (10th Cir. 1994) (court looks to totality of conduct when determining whether right to compel arbitration has been waived). Dilatory conduct by the party urging arbitration alone is not sufficient; rather, the party opposing arbitration must show that it has been prejudiced. *Adams*, 888 F.2d at 701; *Bd. of Educ. Taos Mun. Schs.*, 709 P.2d at 185. Doubts are resolved against a finding of waiver. *Id.* The Tenth Circuit has set forth a number of factors to consider:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether "the litigation machinery has been substantially invoked" and the parties "were well into preparation of a lawsuit" before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) "whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place"; and (6) whether the delay "affected, misled, or prejudiced" the opposing party.

*Metz*, 39 F.3d at 1489 (quoting *Peterson v. Shearson/American Express*, 849 F.2d 464,

19

467–68) (quotation marks and brackets in original).

The waiver standards articulated above presuppose the existence of a right to arbitrate; the question whether a right has been waived necessarily does not arise before the right exists.  The Court thus considers first Plaintiffs' argument that the arbitrable nature of some of their claims was apparent earlier in the litigation.

Plaintiffs argue that it has been clear since the outset of this litigation that their claims implicate prices under Non-Qualified Contracts.  Their argument conflates two separate, though related, issues raised by Hess' purported use of Non-Qualified Contracts.  One issue is whether the FSA permits Hess to use prices from Non-Qualified Contracts before such time as approval of the Qualified Contracts has expired.  The second issue is whether the new prices themselves, which the FSA contemplates may be based on Non-Qualified Contracts, are proper.  The distinction that Plaintiffs overlook is critical:  The first issue involves a purported breach of the FSA and therefore is excluded from arbitration; the second issue is subject to mandatory arbitration.

The Court considers below each of the events that Plaintiffs claim should have put Hess on notice that some of their claims fall within the second category.

**June 6, 2006: The Class Action Complaint**

Plaintiffs refer to paragraphs 24 and 25 of the Complaint which state:

24.     The [FSA] requires Hess to value all volumes of Unit $CO_2$ allocated to it based on the volume weighted average price derived from sales or deliveries under "Qualified Contracts" (as listed for Hess on Exhibit D-2 to the [FSA]).

25.     The "prices" reported to plaintiffs indicate that Hess failed to perform the valuation of Unit CO2 as required by the [FSA].

[Doc. 136-2 at 12.]  The Court concludes that these allegations are insufficient to trigger the arbitration clause.

The presumption of arbitrability does not apply with the same force when the arbitration clause is narrowly drawn.  *Cummings*, 404 F.3d at 1262; *see also Heimann*, 144 P.3d at 115 ("The presumption [of arbitrability] does not operate to create a right to arbitrate claims the parties have not agreed to arbitrate.").  Thus, in the face of general allegations such as are contained in the Complaint, the Court cannot apply a presumption of arbitrability to the same extent the presumption would apply if the arbitration clause were broad.  Rather, specific allegations clearly triggering arbitrability are necessary before arbitration will be compelled.

Such specific allegations are lacking in the Complaint.  In paragraph 24 of the Complaint, Plaintiffs refer to Hess's alleged failure to utilize the FSA methodology.  As explained above, a claim that Hess failed to adhere to the methodology is a breach of contract claim that is expressly excluded from arbitration.  Paragraph 25 also refers to valuation "required by the FSA."  Merely challenging the "prices" does not necessarily trigger arbitration under this Court's interpretation of the arbitration clause.  Price claims are only subject to arbitration in the event that there are no longer Qualified Contracts to serve as benchmarks.  In paragraphs 24 and 25 of the Complaint, Plaintiffs do not indicate that they are challenging new benchmarks, nor do they refer to prices under Non-Qualified Contracts

21

or under Qualified Contracts that have been amended or extended.  Furthermore, *Heimann*

determined that similar allegations did not present arbitrable claims.

### July 14, 2006:  Hess's Answer to Class Action Complaint for Breach of Contract, Damages, and Declaratory Relief [Doc. 2]

Plaintiffs allege that because Hess asserted arbitration as an affirmative defense in its

Answer, it therefore understood that some claims were subject to arbitration.  The Court does

not agree.  Affirmative defenses can be waived if they are not asserted, not *because* they are

asserted.  *See Bd. of Educ. Taos Mun. Schs.*, 709 P.2d at 187 (holding that mention of right

to arbitrate as an affirmative defense suffices to keep the right alive).  Facts and legal theories

are not fully developed at the pleading stage.  Asserting an affirmative defense does not, as

Plaintiffs suggest, trigger a duty to demand arbitration.

### July 17, 2006:  Becker's Work Papers

Plaintiffs' argument with respect to the Becker work papers is that Hess was aware

as early as 2004 that a pricing claim under the FSA necessarily involved a challenge to Non-

Qualified Contracts.  Plaintiffs argument is based on statements made by Stephen L. Becker

who apparently is a defense expert in this case and was in the *Heimann* case.  In connection

with *Heimann*, Mr. Becker opined in 2004 that a challenge to the values paid is "necessarily

a challenge to Non-Qualified Contracts...."  [Doc. 93-2 at 3.]

I do not find this argument persuasive.  The statements upon which Plaintiffs rely

were made in the context of different litigation involving different parties.  Mr. Becker's

statements were based on royalties paid by Shell/Kinder Morgan, not Hess.  [Doc. 93-2 at

3.] Plaintiffs have failed to show that Hess should be bound by statements made on behalf of Shell/Kinder Morgan, merely because it employs the same expert. Furthermore, as discussed above, Plaintiffs' challenge to the use of Non-Qualified Contracts does not, of itself, necessarily trigger the arbitration clause. A claim only becomes arbitrable when it is clear that Plaintiffs are challenging pricing a under Non-Qualified Contract or future benchmark.

**June 6, 2007:  Hess' Requests for Admission**

Plaintiffs assert that Requests for Admissions served by Hess on June 6, 2007 indicate that Hess was on notice of the arbitrable nature of the claims. They argue that the Requests "focus on the issue of the Complaint charging Hess with pricing $CO_2$ based on Non-Qualified and other unapproved contracts."

The Court is not persuaded by this argument. First, arbitrability in this instance is determined by the claims and allegations made by *Plaintiffs*. Thus, discovery propounded by Hess does not demonstrate that a claim is arbitrable. Furthermore, the Requests for Admission do not ask Plaintiffs to identify in what way the royalties have been underpaid, an inquiry that is key to determining whether a claim is arbitrable. Rather, they seek information regarding Plaintiffs' position as to what the FSA permits or requires. Plaintiffs' responses to these Requests for Admission alone, therefore, only serve to identify areas of dispute regarding interpretation of the FSA.

**July 30, 2007:  Donkin and Harper expert reports**

Plaintiffs contend that two expert reports it provided to Hess on July 30, 2007 also

demonstrate the arbitrable nature of the claims.  The Court does not agree.  Nowhere in the excerpts quoted by Plaintiffs does Mr. Donkin claim that Hess has used a <u>future</u> benchmark that is improper.

Mr. Harper does state, as his second conclusion:  "It appears that alternative benchmarks, contracts and prices were used by Defendant resulting in CO2 values not 'proper' pursuant to the provisions of the [FSA]."  [Doc. 93-8 at 3.]  Though this arguably comes close to alleging that "future" benchmarks are improper, the Court concludes that more specific allegations than are provided by Mr. Harper's brief statement are necessary to trigger arbitration.

The arbitration clause is narrow, describing the scope of arbitrable disputes in specific language.  Mr. Harper's report, on the other hand, is phrased in terms that are very general.  He does not claim that approval under the Qualified Contracts has expired and that Hess is utilizing new benchmarks.  His opinion, which he acknowledges is given without the benefit of the disclosure of the actual royalty calculations, is based solely on the variance between the decrease in royalty payments and the general trend toward higher crude oil prices.  The Court concludes that this general criticism is not sufficient to trigger arbitration.

**October 5, 2007:  Donkin Supplemental Expert Report**

Plaintiffs also point to Mr. Donkin's October 5, 2007 expert report.  In the excerpts quoted by Plaintiffs, Mr. Donkin states that Hess' discovery responses demonstrate that it used Non-Qualified Contracts to determine royalties from October 2003 through May 2007.  [Doc. 93 at 14.]  He then states that he was requested and did in fact prepare calculations at

24

Plaintiffs' request to represent the amount "Hess should have paid to Plaintiffs had Hess used only Qualified Contracts."  [Doc. 93 at 14.]

As discussed above, however, allegations that Hess used Non-Qualified Contracts to determine royalties, without more, is a breach of contract claim.  Mr. Donkin's statements do not trigger arbitration because they do not directly challenge the value of the future benchmark.  Mr. Donkin's opinion is directed at Hess' use of Non-Qualified Contracts, rather than Qualified Contracts, in the methodology and is consistent with Plaintiffs' apparent position throughout the litigation that the FSA does not permit the use of Non-Qualified Contract pricing.  Given the narrow scope of the arbitration clause, Hess was not obligated to demand arbitration merely upon allegations that it had used Non-Qualified Contracts, rather than Qualified Contracts, in violation of the FSA.  There is nothing Plaintiffs have pointed to in Mr. Donkin's October 5, 2007 report that clearly triggered arbitration.

**November 2, 2007:  Becker Expert Report**

Plaintiffs argue that the report of Hess' expert, Stephen L. Becker, demonstrates that Hess knew Plaintiffs' claims were the type that must be decided by arbitration.  It is not necessary to review the Becker report in detail, primarily because it was shortly after the date of the Becker report that Hess claims arbitration was triggered.  Suffice to say that a dispute over whether Non-Qualified Contracts may be used as a source of CO2 pricing (as opposed to a dispute over the price itself) is not arbitrable.  Thus, an arbitrable dispute does not arise when Mr. Becker disagrees with Mr. Donkin's opinion that "the volume-weighted average netback calculation shall be composed <u>exclusively</u> of Qualified Contracts that have not been

25

amended or extended in any way."  [Doc. 93 at 15 (emphasis in original).]

Identification of an arbitrable dispute also does not arise from Mr. Becker's statements that certain price claims *would* be subject to arbitration under Hess' interpretation of the FSA.  In other words, the arbitration clause is not triggered merely because Hess might have anticipated that Plaintiffs' claims could eventually evolve to include arbitrable issues. Plaintiffs are the parties that seek relief and thus define the dispute.  It is their allegations that determine whether a claim is arbitrable.  Until Plaintiffs themselves actually assert an arbitrable claim, Hess was under no obligation to demand arbitration.

The Court thus concludes that *Defendant Hess Corporation's Motion to Compel Mandatory Arbitration of "Price" Claims and to Stay Proceedings Pending Arbitration* was filed within a reasonable time after an arbitrable claim arose, and that waiver has not occurred.

## V.   *PLAINTIFFS' MOTION NO. 1 FOR PARTIAL SUMMARY JUDGMENT STRIKING HESS' AFFIRMATIVE DEFENSE OF MANDATORY ARBITRATION [Doc. 81]*

Plaintiffs move for summary judgment on Hess' arbitration defense.  The Court concludes that Plaintiffs have failed to meet their burden, thus, their motion must be denied.

### A.   **Summary Judgment Standards**

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "When a

26

motion for summary judgment is made and supported as provided in this rule, an adverse

party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ."

Fed.R.Civ.P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts

showing that there is a genuine issue for trial."  Id.

It is not the Court's role to weigh the evidence, assess the credibility of witnesses, or

make factual findings in ruling on a motion for summary judgment.  Rather, the Court

assumes the evidence of the non-moving party to be true, resolves all doubts against the

moving party, construes all evidence in the light most favorable to the non-moving party, and

draws all justifiable inferences in the non-moving party's favor. *Hunt v. Cromartie*, 526 U.S.

541, 551–52 (1999).  Judgment is appropriate as a matter of law if the nonmoving party has

failed to make an adequate showing on an essential element of his case, as to which he has

the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986);

*Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

**B.**      **Applicability of the *Heimann* Case**

Plaintiffs assert that the issue of the arbitrability of its claims is controlled by the New

Mexico Court of Appeals decision in *Heimann,* which construed and applied the same

arbitration clause at issue here to a concededly similar complaint.  In fact, the parties agree

that the complaint in *Heimann* is substantially identical to Plaintiffs' complaint in this

lawsuit.

The New Mexico Court of Appeals did indeed hold that claims for breach of contract,

breach of the implied covenant of good faith and fair dealing, and breach of an implied

covenant to market—the same causes of action Plaintiffs here assert—fell within the exclusionary clause of the arbitration agreement. *Heimann*, 144 P.3d at 117.[8]  The Court of Appeal's conclusion, however, was based solely on allegations in the complaint.  In the present case, this Court has the benefit of discovery that the parties have developed through the course of the litigation.  Thus, though the Court agrees that *Heimann* is applicable authority, and indeed has relied upon it for the standards it articulates, the Court does not agree that the result in this case must be identical to the result in *Heimann*.  This case is factually distinguishable from *Heimann* because of the more detailed facts developed through discovery that are available to evaluate arbitrability.

Plaintiffs argue that the "only thing that has changed over the course of discovery is that plaintiffs have learned exactly how Hess calculated royalties, and their expert has expanded his damage calculations based on those Hess disclosures." [Doc. 103 at 6.]  The revelation through discovery of exactly how Hess calculated royalties, and the ensuing crystallization of Plaintiffs' claims, however, is precisely what makes the difference in this case between arbitrability and nonarbitrability.  As the New Mexico Court of Appeals concluded in *Heimann*, arbitrability cannot be determined from general allegations that the royal payments were too low, or that they were improper.  Rather, it is necessary to know exactly how the royalty payment is alleged to be improper before it can be determined

---

[8]This Court does not read the *Heimann* opinion as standing for the proposition that Plaintiffs' characterization of its claims determines the question of whether the claims are arbitrable.  Rather, the Court of Appeals looked to the allegations in the Complaint and determined that the claims sounding in contract were supported by allegations that Defendant Kinder Morgan had breached the FSA.   *Heimann*, 144 P.3d at 116–17.

whether the claim is arbitrable.

While it is true that the New Mexico Court of Appeals in *Heimann* did not look beyond the complaint, the Court does not view *Heimann* as announcing a rule that arbitrability is determined solely by the language of the complaint.  Rather, it appears that the parties agreed that the language of the complaint was all that the Court need consider in that case.  *Heimann*, 144 P.3d at 115 ("The parties agree that we ought not look beyond the language of the complaint to determine whether Plaintiffs' claims are subject to arbitration.") Furthermore, New Mexico law expressly recognizes that claims that do not at first appear arbitrable may evolve into arbitrable claims as the case proceeds.  *Heimann* 144 P.3d at 120. Claims that discovery reveals are arbitrable will not be permitted to go to trial.  *See Heimann* 144 P.3d at 120.

As in *Heimann*, Plaintiffs' Complaint here does not present allegations that are on their face, arbitrable claims.  Expert testimony eventually revealed, however, that Plaintiffs were challenging future benchmark pricing under Non-Qualified Contracts.  Such allegations were not clearly present in *Heimann*.  There, the Court of Appeals noted:

> It is true that one way Kinder Morgan could have paid Plaintiffs "less than the proper and real value" is by using the calculation method provided by the [FSA], but including improperly valued non-qualified contracts in the average....However, Plaintiffs allegations are very general.  They indicate that the royalties they were paid were too low, but that they have limited information[.]

*Heimann*, 144 P.3d at 118.

In contrast to a broad arbitration clause that requires arbitration of, for example, any and all disputes related to the agreement, the arbitration clause here is narrow.  Not only does

it exclude a broad category of disputes, it is triggered only by a specific type of dispute.  It therefore is not inconsistent with *Heimann*, that the arbitrable nature of some claims would not be apparent from the pleadings, but would only be revealed after discovery.  This is especially true in a case such as this, which involves competing experts and numerous complex variables that affect the ultimate royalty payment.  The Court therefore rejects Plaintiffs' contention that *Heimann* compels the conclusion that none of the claims in this case are arbitrable.  In sum, *Heimann* was an application of general principles of law to the specific facts before it.  This Court is presented with different facts and therefore reaches a different conclusion than did the *Heimann* court.

C.      **Plaintiffs' waiver argument**

Plaintiffs assert that Hess has waived arbitration by failing to take action to enforce the right within a reasonable time and by actively participating in the lawsuit.  The Court rejects this contention and adopts its reasoning as set forth in Section IV.D. above.

Hess had no duty to demand arbitration in the absence of an arbitrable claim.  As discussed above, allegations by Plaintiffs clearly triggering arbitration did not occur until November 2007, after several rounds of expert discovery.[9]  The Court also rejects Plaintiffs' arguments that Hess waived arbitration by participating in discovery, consenting to class certification, filing two motions,  and attending court-mandated conferences.  Hess was not required to refrain from participating in the lawsuit on the chance that an arbitrable claim

---

[9]Plaintiffs do not claim the motion to compel arbitration was untimely when measured from the date of Mr. Donkin's deposition in November 2007.

eventually would be asserted.

Plaintiffs cite the *Metz* factors but fail to apply them in a meaningful manner. Moreover, inherent in the *Metz* factors is the assumption that an arbitrable claim has arisen. Finally, though Plaintiffs claim that prejudice is "manifest," the Court concludes that any prejudice was not caused by delay on Hess' part, but is primarily due to the eleventh hour revelations that triggered arbitration.

In sum, the Court finds that though Hess did not move to enforce arbitration until relatively late in the litigation, the Court cannot conclude that Hess was dilatory when arbitrable claims were not clearly asserted until discovery was nearly concluded. Plaintiffs have thus failed to meet their "heavy burden."

## VI.   CONCLUSION

For the reasons set forth above, the Court concludes that Defendant's motion should be **GRANTED in part** and Plaintiffs' Motion should be **DENIED.**

**IT IS, THEREFORE, ORDERED** that *Plaintiffs' Motion No. 1 for Partial Summary Judgment Striking Hess' Affirmative Defense of Mandatory Arbitration with Supporting Authorities* [Doc. 81], filed January 22, 2008 is **DENIED;**

**IT IS, FURTHER, ORDERED** that *Defendant Hess Corporation's Motion to Compel Mandatory Arbitration of "Price" Claims and to Stay Proceedings Pending Arbitration* [Doc. 83], filed January 25, 2008 is **GRANTED in part;**

**IT IS, FURTHER, ORDERED** that Plaintiffs' claims will be referred to binding arbitration pursuant to paragraph 16 of the *Class Action Settlement Agreement*, filed in *Doris*

*Feerer, et al. v. Amoco Production Company, et al.*, Civ. No. 95-0012 JC/WD, only insofar as such claims regard (a) the price or value under Non-Qualified Contracts (or under amendments to or extensions of contracts establishing new prices or values under Qualified Contracts as referenced in sub-paragraph 14(i) of the *Class Action Settlement Agreement*) utilized by Hess in establishing royalty settlement values for purposes of payment to its Respective Owners or (b) Non-Qualified Other Transportation Charges (or amendments to or extensions of contracts or other arrangements establishing Qualified Other Transportation Charges as referenced in sub-paragraph 14(i) of the *Class Action Settlement Agreement*) utilized by Hess in establishing royalty settlement values for purposes of payment to its Respective Owners, as set forth in this *Memorandum Opinion and Order*;

**IT IS, FURTHER, ORDERED** that the parties shall submit additional briefing regarding issues relative to the requested stay of this litigation, as further set forth by the Court in *Order to Submit Additional Briefing* entered concurrently herewith.

**SO ORDERED** this 26th day of September 2008**,** in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge